

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ASSOCIATION BENEFIT SERVICES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 04 C 3271 |
| | ) | |
| ADVANCEPCS HOLDING CORP.; ADVANCEPCS MAIL SERVICES OF BIRMINGHAM, INC.; CAREMARK RX, INC.; and CAREMARKPCS, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Association Benefit Services, Inc. ("ABS") has sued AdvancePCS, now known as CaremarkPCS ("AdvancePCS"), and Caremark Rx, Inc., alleging that defendants fraudulently induced ABS to foster a relationship between AdvancePCS and the American Automobile Association ("AAA") by promising to pay ABS certain future commissions with no intention of fulfilling that promise. Alternatively, ABS contends that defendants breached its contract to provide commissions to ABS. In the event that the Court determines that a contract did not exist, ABS asks the Court to impose a constructive trust on defendants, arguing that they have been unjustly enriched by their fraudulent actions. This diversity action is before the Court on AdvancePCS and Caremark Rx's motions for summary judgment with respect to each of the three claims. For the reasons stated below, the Court grants defendants' motions.

1

## Facts

ABS arranges contracts between companies and prescription benefit managers to administer prescription benefit plans. In return, ABS earns commissions based on the number of prescriptions filled. Jerome Coppage, former president of ABS, first contacted Chris Lee of AdvancePCS in January 2003 regarding an opportunity to act as a prescription benefit manager for a discount prescription drug card program available to AAA members. At the time, Lee was vice president of sales for AdvancePCS, a prescription benefit management firm. ABS did not have a contract with AAA. Rather, ABS acted as a consultant to organizations looking for a prescription benefit manager. The parties dispute whether a consultant in this business is typically paid by the client, in this case AAA, or the prescription benefit manager.

From January to May of 2003, Lee and ABS engaged in negotiations. Eventually, ABS arranged a meeting between Lee and AAA representatives that was scheduled for May 19, 2003. Before Lee met with AAA, he met with Coppage and Jack Bestrom, who was also affiliated with ABS, at a hotel near AAA headquarters in Florida. According to Lee, Bestrom told him that he needed a letter acknowledging that AdvancePCS was willing to pay ABS commissions of $0.25 per prescription filled at retail and $1.50 per prescription by mail. He made it clear that Lee would not be allowed to meet with ABS's client, AAA, until he furnished ABS with the letter outlining the commissions. Lee testified that he was willing to provide ABS with a letter confirming that AdvancePCS would pay fees to ABS if AdvancePCS was able to secure a contract with AAA, but that he was under the impression that ABS was AAA's consultant and that ABS's fees were included in any fees to be requested by AAA. Lee had obtained authorization from AdvancePCS's underwriting department to make such an offer.

2

Lee prepared the letter on his laptop computer by modifying a letter he had sent to Coppage on May 13, 2003 to include a statement regarding commissions. He printed one copy of the letter, which contained his signature, and gave it to Bestrom. The letter begins by thanking Coppage for partnering with AdvancePCS and expressing excitement about working with ABS toward delivering consumer card services with AAA. *See* Defs' Ex. 5C. It then states, "For the length of time AdvancePCS delivers benefits to AAA, I want to confirm that we will be paying commissions to Association Benefits Services of $0.25 per retail claim and $1.50 per mail order claim." *Id.* This paragraph was added by Lee on May 19. ABS claims that from May through August 2003, in reliance on this promise, it provided AdvancePCS with information necessary to adjust its prescription management proposal to meet AAA's needs. ABS also alleges that in reliance on AdvancePCS's promise, it refrained from working with competitor prescription benefits managers, including Merck and Caremark, during that time period.

It is undisputed that Coppage did not sign this letter on May 19, 2003. In fact, AdvancePCS never received a version of the letter that Coppage had signed. But in its fourth amended complaint in this case, ABS attached a copy of the letter that contained Coppage's signature, along with the language "Accepted and agreed this 19th day of May, 2003 by: Association Benefit Services, Inc." *See* Defs' Ex. 5D; Defs' 56.1 Stmt. ¶ 109. Coppage testified that he signed the letter at home a few days after the May 19 meeting. Pl's 56.1 Resp. ¶ 115-16. ABS maintains that this letter constitutes an operative contract between ABS and AdvancePCS, though it asserts that Coppage's signature was unnecessary to form a contract. ABS also acknowledges that it would be paid under the May 19, 2003 letter only if AdvancePCS and AAA entered into a contract. *Id.* ¶ 127.

3

After providing ABS with the letter, Lee met with AAA and, according to Lee, was informed for the first time that the revenue sharing fee requested by AAA did not include any fees for ABS. After his May 19, 2004 meeting with AAA, Lee claims he began negotiations with AAA and ABS regarding all aspects of the AAA program. AdvancePCS contends that during Lee's subsequent discussions with Robert Blixt, CEO of ABS, and other ABS officers, ABS agreed to make adjustments to its fees to ensure that a deal was completed between AdvancePCS and AAA. Among these communications was an e-mail from Lee to Blixt on June 17, 2003. The e-mail states:

> At long last, attached is the revised offer. Changes to note: Retail Brand dispensing fee has been the sore subject: with you and us kicking in, we've been able to get to $3.75. Commissions on retail brand: $.15 to ABS. All else remains constant. Contract will be released shortly reflecting this.

Def's Ex. 5J. ABS denies that it ever agreed to lower the commissions stated in the May 19, 2003 letter.

Around the third week of June, AdvancePCS claims, Lee learned from AAA that ABS was not AAA's consultant and that ABS had no contractual relationship with AAA. Lee sent an e-mail to Blixt and Bestrom on June 23, 2003 confirming this information. *See* Def's Ex. 5L. Shortly after, in a June 26, 2003 e-mail to Blixt, Bestrom, and Coppage, Lee wrote,

> I was reading through my old files this week and need to re-tract the letter dated May 19th to Jerry re: AAA. In that letter I offered that we would pay ABS $0.25 per claim while we managed the AAA account. This doesn't make any sense any more in light of our on-going negotiations. I just want to point out that this is not in effect as we don't have any negotiated agreement with AAA or ABS. . . . The contract that we sign with y'all and with AAA will reflect all the accurate financials and obligations.

Def's Ex. 5L. Neither party has produced a response to this e-mail.

4

AdvancePCS maintains that Lee eventually verbally offered Blixt and Bestrom a $.025 commission per prescription if AdvancePCS was awarded the AAA contract. It asserts that ABS verbally accepted this offer. Again, ABS denies this allegation. On September 1, 2003, AdvancePCS tendered a seven-page written contract to ABS that included the $.025 commission, but ABS rejected the proposed contract. Ultimately, AdvancePCS and AAA entered into a contract to begin operating the AAA program on October 1, 2003.

## Discussion

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To determine whether a genuine issue of material fact exists, the Court views the record in the light most favorable to ABS, the non-moving party in this instance, drawing reasonable inferences in its favor. *Id.* at 322. Nonetheless, a party opposing summary judgment may not simply rest on the pleadings but must instead affirmatively demonstrate that there is a genuine issue for trial. *Payne v. Pauley*, 337 F.3d 767, 771 (7th Cir. 2003); *see also Davis v. GN Mortgage Corp.*, 244 F. Supp. 2d 950, 955 (N.D. Ill. 2003) ("A defendant is entitled to put the plaintiff to his proofs and demand a showing of the evidence."). Thus, ABS must produce specific facts to support its contentions and cannot rely on speculation or conclusions without factual support. *Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1146 (7th Cir. 1994).

### 1. AdvancePCS' motion for summary judgment

Before turning to the merits of ABS's claims against AdvancePCS, the Court addresses

the admissibility of Lee's affidavit and Dr. Thomas Kravis's expert report, as our determinations regarding these admissibility issues directly impact what evidence we can consider on the motions for summary judgment.

ABS asks the Court to strike Lee's affidavit in its entirety. Included among ABS's reasons for why each paragraph of the affidavit should be excluded are lack of personal knowledge, lack of foundation, Lee expressing expert opinions, and hearsay. The Court is not persuaded by any of ABS's arguments. Lee's affidavit is based on personal knowledge, and despite some fuzziness as to exact dates and times, he lays a sufficient foundation for his testimony. Moreover, the subject matter of the affidavit is appropriate – Lee was the primary AdvancePCS employee dealing with ABS. Thus, the affidavit is properly before the Court.

AdvancePCS disputes the admissibility of several opinions of ABS's retained expert, Dr. Kravis. The admission of expert testimony is governed by Federal Rule of Evidence 702 and the principles set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Under the two-part analysis the Seventh Circuit has endorsed for evaluating such testimony, the Court first must determine whether the expert's testimony is reliable. *Cummins v. Lyle Industries*, 93 F.3d 362, 367 (7th Cir. 1996). This requires the Court to assess whether the expert is qualified in the relevant field and to examine the expert's methodology. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). Second, the Court must determine if the expert's testimony will assist the trier of fact in understanding the evidence or determining a fact at issue in the case. *Id.* at 721.

Dr. Kravis' opinions on liability come nowhere near meeting the requirements of Rule 702 and *Daubert*. With respect to his opinions on the breach of contract claim, Dr. Kravis opines

that the May 19 letter constitutes a contract between AdvancePCS and ABS. He defines the factors necessary to create an enforceable contract and opines that AdvancePCS breached the contract. Federal Rule of Evidence 704 allows experts to offer opinions on an "ultimate issue," but only if an expert opinion on this topic would assist the jury. Dr. Kravis' testimony concerning AdvancePCS's purported breach merely tells the jury what result to reach. *See Dahlin v. Evangelical Child and Family Agency*, No. 01 C 1182, 2002 WL 31834881, at *3 (N.D. Ill. Dec. 18, 2002). His testimony largely relates to purely legal matters, and he makes several legal conclusions that would determine the outcome of the case, which is not a proper subject for expert testimony, *see Good Shepherd Manor Foundation, Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003), at least not from Dr. Kravis, who is a physician by training and has no apparent legal experience.

Moreover, whether AdvancePCS intended the letter to constitute a contract offer is a matter within the province of the jury as ultimate finder of fact. *See Aerotech Resources, Inc. v. Dodson Aviation, Inc.*, No. 00-2099-CM, 2001 WL 474296, at *2 (D. Kan. Apr. 4, 2001) (striking expert's testimony regarding parties' intent in entering into a contract). Finally, expert opinion interpreting contract language is inadmissible absent a need to clarify or define terms, which is not the case here. *See TCP Indus., Inc. v. Uniroyal, Inc.*, 661 F.2d 542, 549 (6th Cir. 1981); *see also Delta Mining Corp. v. Big River Electric Corp.*, 18 F.3d 1398, 1402 (7th Cir. 1994). Thus, Dr. Kravis' opinions concerning AdvancePCS's liability on the breach of contract claim are inadmissible.

Dr. Kravis' opinions regarding the fraud claim fare no better. Dr. Kravis defines fraud by setting forth a definition from Black's Law Dictionary. He then summarizes documents and

7

other evidence he reviewed and reaches the conclusion that AdvancePCS committed fraud by deliberately deceiving ABS. His conclusion that AdvancePCS committed fraud extends beyond the permissible scope of expert testimony. "This is a quintessential jury determination on which the Court will instruct a jury concerning the factors it is to consider." *Dahlin*, 2002 WL 31834881, at *3. Similarly, Dr. Kravis's testimony regarding intent is unhelpful to the trier of fact, as the jury is amply qualified to review the evidence and draw its own inferences. And again, Dr. Kravis does little more than tell the jury what result it should reach. His testimony on the fraud claim does not satisfy Rule 702 and is therefore inadmissable.

In sum, the Court excludes each of Dr. Kravis' liability opinions. It is unnecessary to reach his damages testimony, as the Court grants summary judgment for defendants on all three claims.

### a. Fraud

ABS contends that Lee made numerous false statements and representations to ABS employees to induce ABS to work exclusively with AdvancePCS and refrain from offering the AAA account to other prescription benefit management firms. More specifically, ABS maintains that by waiting until September 2003 to inform ABS that it would not honor its written contract of May 19, 2003, AdvancePCS committed fraud for the purpose of securing profits and prestige. *See* Fourth Amend. Compl. ¶ 13.

To establish fraud under Illinois law, a plaintiff must prove that the defendant made a false statement of material fact, which the defendant knew or believed to be false, with the intent to induce plaintiff to act, and that the plaintiff justifiably relied on the statement and was damaged as a result. *Houben v. Telular Corp.*, 231 F.3d 1066, 1074 (7th Cir. 2000); *Williams v.*

*Chicago Osteopathic Health Sys.*, 274 Ill. App. 3d 1039, 1048, 654 N.E.2d 613, 619 (1995). Promissory fraud entails a false representation of intent concerning future conduct, for example, promising to perform a contract without the actual intent to do so. *See Houben*, 231 F.3d at 1074 (citing *Doherty v. Kahn*, 289 Ill. App. 3d 544, 682 N.E.2d 163 (1997)). Generally, to prove promissory fraud, a plaintiff must demonstrate that the promise was part of a "scheme" to defraud. *Id.* Because promissory fraud is easy to allege but difficult to disprove, Illinois courts have placed a "deliberately high" burden on plaintiffs in these types of cases. *Bower v. Jones*, 978 F.2d 1004, 1012 (7th Cir. 1992).

ABS has failed to present evidence sufficient to create a triable jury issue on the question of whether AdvancePCS had fraudulent intent at the time Lee created the May 19, 2003 letter. ABS's entire theory is premised on the circular reasoning that because AdvancePCS did not fulfill its oral and written agreements, it must have intended all along not to honor the agreement. For instance, in its response, ABS reasons that "[t]he whole agenda of Advance PCS was to defraud ABS .... AdvancePCS and its officers and directors knew that their statements were false when made on May 19, 2003. This is based on AdvancePCS reneging on everything that they agreed to." Pl's Resp. at 27. This is insufficient; broken promises do not by themselves establish pre-existing fraudulent intent. *See Francis v. Bankcard America, Inc.*, No. 93 C 5510, 1999 WL 1289110, at *8 (N.D. Ill. Jan. 4, 1999).

The only other evidence of fraudulent intent identified by ABS is Blixt's testimony that "[r]eflecting back, [he] believe[s] that at the time [AdvancePCS] had no intention of honoring any agreement to which they had agreed to." Blixt Dep. at 94-95. Based on the fact that AdvancePCS did not live up to its oral and written contracts, Blixt opined in retrospect that Lee

9

had been coached to use the correct words in his dealings with ABS. *Id.* at 95. Blixt's subjective speculation is insufficient to create a genuine issue of material fact as to AdvancePCS's intent. In short, ABS has failed to present evidence from which a jury reasonably could find that AdvancePCS intended to defraud ABS on May 19, 2003. Accordingly, the Court grants summary judgment in favor of AdvancePCS on the fraud claim.

### b. Breach of contract

To establish breach of contract under Illinois law, a plaintiff must first demonstrate the existence of a valid and enforceable contract. *Ken-Pin, Inc. v. Vantage Bowling Corp.*, No. 02 C 7991, 2004 WL 783092, at *3 (N.D. Ill. Jan. 20, 2004). For a contract to be enforceable, the face of the contract must evidence a sufficiently concrete expression of the essential terms of the agreement and the parties' intent to be bound. *Ocean Atlantic Devel. Corp. v. Aurora Christian Schools, Inc.*, 322 F.3d 983, 995 (7th Cir. 2002); *Academy Chicago Publishers v. Cheever*, 144 Ill. 2d 24, 29, 578 N.E.2d 981, 983 (1991). Included among the essential terms is the requirement that a contract contain mutuality of obligation, such that both parties of an agreement are bound. *Kraftco Corp. v. Kolbus*, 1 Ill. App. 3d 635, 638, 274 N.E.2d 153, 155 (1971).

No reasonable jury could conclude that the May 19, 2003 letter amounted to an enforceable contract. Though informal writings between parties can constitute a binding agreement, the letter does not contain definite and certain terms, among other things, it wholly lacks mutuality of obligation. No mention is made of any obligation on ABS's part to take any action or confer a benefit to AdvancePCS. ABS argues that mutuality of obligation did exist, as ABS had already performed its obligation to introduce AdvancePCS to AAA. But the existence

10

of a binding agreement between ABS and AdvancePCS turns on what they expressly manifested in the writing, not on ABS's subjective beliefs at the time. *See Ocean Atlantic*, 322 F.3d at 995-96; *Cheever*, 144 Ill. 2d at 29, 578 N.E.2d at 983. Thus, ABS has failed to present evidence sufficient to show that a genuine issue of material fact exists as to whether the May 19, 2003 letter constitutes an enforceable contract.

ABS contends that at a minimum, the May 19, 2003 letter was an offer by AdvancePCS, which ABS accepted, thus creating a binding contract. But there is no evidence that ABS communicated its acceptance to AdvancePCS. ABS argues that it accepted the offer by performance when it took Lee to meet with AAA representatives on May 19, 2003. ABS correctly points out that an offeree may accept an offer by performance of a desired act. *See McGee v. First Nat. Bank of Brighton*, 220 Ill. App. 3d 976, 981, 581 N.E.2d 341, 343 (1991). But as is implicit in the May 19 letter, ABS's commission was conditioned on AdvancePCS securing a contract with AAA, not on ABS simply introducing the two companies. Furthermore, ABS's own president believed that his signature – not ABS's performance – was needed to supply the requisite acceptance, as indicated by his deposition testimony and the language accompanying his signature on the letter. *See* Coppage Dep. at 102-03; Defs' Ex. 5D. Thus, ABS has not shown that a genuine dispute exists over whether it accepted AdvancePCS's purported offer.

Then, on June 17, 2003, Lee sent Blixt an e-mail attaching a "revised offer." *See* Defs' Ex. 5J. This effectively revoked AdvancePCS's May 19, 2003 offer. E. ALLAN FARNSWORTH, CONTRACTS §3.17 (3d ed. 1999) (to revoke offer, it is sufficient for offeror to indicate an intention not to make the proposed contract; a subsequent offer inconsistent with the original

11

offer may suffice); RESTATEMENT (SECOND) OF CONTRACTS § 43 (1981). Moreover, on September 1, 2003, AdvancePCS tendered a seven-page written contract to ABS that included the $.025 commission. In short, AdvancePCS made at least two revised offers that functioned to revoke the May 19, 2003 offer (if in fact it was an offer whose acceptance would bring a binding contract into being). Thus, as a matter of law, the parties did not form a contract. *See* RESTATEMENT (SECOND) OF CONTRACTS § 43 (1981) (offeree's power of acceptance is terminated when he receives from offeror a manifestation of an intent not to enter into the proposed contract).

In a last-ditch attempt to show that a genuine issue of material fact exists as to whether a contract was formed, ABS suggests that the May 19, 2003 letter was actually AdvancePCS's acceptance of a prior verbal offer by ABS. But this argument is undermined by the signed version of the May 19, 2003 letter, in which Coppage wrote "[a]ccepted and agreed," and by Coppage's testimony that it was important for him to sign the document because it was an affirmation that ABS was accepting the agreement, and that he felt the agreement was accepted when he signed it. Coppage Dep. at 102-03.

In sum, ABS has failed to provide evidence sufficient for a jury reasonably to conclude that the parties entered into a binding contract.

    c.    **Unjust enrichment**

Because the Court has concluded that a binding contract did not exist, we must next address ABS's claim that it is entitled to a constructive trust on a theory of unjust enrichment. To withstand summary judgment on this claim, ABS must demonstrate that a genuine dispute exists as to whether AdvancePCS unjustly retained a benefit to ABS's detriment and whether

AdvancePCS's retention of the benefit violates the fundamental principles of justice, equity, and good conscience. *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 160, 545 N.E.2d 672, 679 (1989). When evaluating the "unjustness" of the enrichment in cases in which a third party transferred a benefit to the defendant, the plaintiff must initially show one of the following: the benefit should have been given to the plaintiff, but the third party mistakenly gave it to the defendant; the defendant procured the benefit from the third party through some type of wrongful conduct; or the plaintiff for some other reason had a better claim to the benefit than the defendant. *Id.* at 161-62, 545 N.E.2d at 679. Because AAA transferred a benefit to AdvancePCS, ABS must provide evidence sufficient to demonstrate that a material issue of fact exists as to one of these elements.

ABS has not argued that AAA mistakenly gave the benefit to AdvancePCS and has not asserted some other reason why it has a better claim to the benefit. Though not addressed in its response brief, ABS makes it clear in its fourth amended complaint that it bases its claim solely on AdvancePCS's alleged fraudulent conduct. Because the Court has already found that ABS has not shown a genuine dispute with respect to whether AdvancePCS employees intended to defraud ABS, ABS cannot sustain a claim that AdvancePCS engaged in wrongful conduct to obtain a benefit and was thus unjustly enriched. *See Athey Products Corp. v. Harris Bank Roselle*, 89 F.3d 430, 436 (7th Cir. 1996). AdvancePCS is therefore entitled to summary judgment on this claim.

2. **Caremark Rx's motion for summary judgment**

ABS does not assert independent misconduct against Caremark Rx but rather seeks to hold it liable for the acts of its subsidiary, AdvancePCS, on the theory that AdvancePCS is the

13

mere alter ego of Caremark Rx. Because the Court has concluded that AdvancePCS cannot be held liable on any of ABS's claims, it follows that Caremark Rx is entitled to summary judgment on all claims.

## Conclusion

For the reasons stated above, the Court grants Advance PCS's motion for summary judgment [docket no. 107] and Caremark Rx's motion for summary judgment [docket no. 109]. The trial date of January 9, 2006 is vacated. The Clerk is directed to enter judgment in favor of the defendants.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: September 23, 2005